Erik Strindberg (Utah Bar No. 4154)
Matt Harrison (Utah Bar No. 13735)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Salt Lake City, UT  84106
Plaza 721Telephone (801) 359-4169
Facsimile (801) 359-4313
Email: erik@utahjobjustice.com
        matt@utahjobjustice.com

Alan J. Reinach, Esq., *pro hac vice pending*
Church State Council
2686 Townsgate Road
Westlake Village, CA 91361
Fax:  805-497-7099
Phone: 805-413-7398
Email: ajreinach@churchstate.org.

*Attorneys for Plaintiffs Richard Tabura and Guadalupe Diaz*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

---

| | |
|---|---|
| **RICHARD TABURA** and **GUADALUPE DIAZ**, <br><br> Plaintiffs, <br> v. <br><br> **KELLOGG USA INC.** <br><br> Defendant. | **COMPLAINT** <br><br> Case No.  **1:14-CV-00014-TC** <br><br> **JURY DEMAND** |

---

Plaintiffs Richard Tabura ("Mr. Tabura") and Ms. Guadalupe Diaz ("Ms. Diaz") (Mr. Tabura and Ms. Diaz will collectively be referred to as "Plaintiffs"), by and through their undersigned attorneys, hereby submit the following Complaint against Kellogg USA Inc. ("Kellogg") as follows:

**Nature of the Case**

Plaintiffs are active members of the Seventh-Day Adventist Church whose members celebrate the Sabbath from sundown on Friday to sundown on Saturday during which time they refrain from working.  Kellogg terminated them from their positions at the Kellogg plant in Clearfield, Utah, for refusing to violate their Sabbath by not working on Saturdays. Kellogg's actions violate Title VII of the Civil Rights Act.

**Parties**

1.      Mr.  Tabura and Ms. Diaz were, at all times relevant herein, employees of Kellogg protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, and members of a protected class based on religion – Seventh-day Adventist.

2.      Mr.  Tabura is a resident of Roy, Utah, in Weber County.

3.      Ms.  Diaz is a resident of Layton, Utah, located in Davis County.

4.      Kellogg is a Michigan corporation registered to conduct business in the State of Utah, and is an employer as defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq*.  Kellogg employs more than 500 persons.

**Jurisdiction and Venue**

5.      This action is brought to remedy Kellogg's religious discrimination and retaliation against Plaintiffs. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42.U.S.C. §§ 2000b and 2000e-(j); the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

6.      Jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §§ 1331, 1337 and 1343.  Jurisdiction is founded upon the existence of a deprivation of Federal Civil Rights, a substantial Federal question, and in the context of employment, a subject of

commerce.

7.      Venue is proper in the United States District Court, District of Utah pursuant to 42

U.S.C. § 2000e-5(f)(3) because Plaintiffs' claims for relief arose out of their

employment by Kellogg at its Morningstar Frozen Food Division in Clearfield, Utah,

where all relevant events and omissions supporting Plaintiffs' claims for relief

occurred.

8.      Plaintiffs timely filed a charge of discrimination alleging religious discrimination

with the Utah Labor Commission and the U.S. Equal Employment Opportunity

Commission [hereinafter "EEOC"]. Plaintiffs each received a right-to-sue letter from

the EEOC and have exhausted their administrative remedies. This complaint is timely

filed within ninety (90) days of receipt of each EEOC right-to-sue letter.

**Factual Allegations**

9.      This action is filed on behalf of two Seventh-day Adventists who suffered religious

discrimination by their employer.  Their claims share many common facts, common

witnesses and common legal issues.

10.     Mr. Tabura and Ms. Diaz are practicing members of the Seventh-day Adventist

Church and at all times relevant to this complaint and throughout their employment

were active members of their congregations.

11.     One of the important teachings of Plaintiff's church is to observe the Sabbath as a day

of rest during which time secular work is not to be performed.

12.     Sabbath observance is important to Seventh-day Adventists for many reasons:  among

them, observance of the Sabbath is one of the Ten Commandments. Seventh-day

Adventists believe that the obligation to refrain from secular work on the Sabbath was

Tabura and Diaz v. Kellogg USA Inc.                                                      Complaint

established by the Creator, not by the church, and that individuals are responsible to God for their faithful obedience or disobedience.

13. Unlike most other Christian churches, members of the Seventh-day Adventist Church celebrate the Sabbath starting on Friday at sundown until sundown on Saturday.

14. Seventh-day Adventists observe the Sabbath at this time, believing that the Bible book of Genesis records how God set apart the evening and morning of the seventh day (Friday evening until Saturday evening) as the Sabbath.

15. Observance of the Sabbath is reflected in the name of the church, i.e., "Seventh-day," and is included among the church's fundamental beliefs, listed as number 20:

> The beneficent Creator, after the six days of Creation, rested on the seventh day and instituted the Sabbath for all people as a memorial of Creation. The fourth commandment of God's unchangeable law requires the observance of this seventh-day Sabbath as the day of rest, worship, and ministry in harmony with the teaching and practice of Jesus, the Lord of the Sabbath. The Sabbath is a day of delightful communion with God and one another. It is a symbol of our redemption in Christ, a sign of our sanctification, a token of our allegiance, and a foretaste of our eternal future in God's kingdom. The Sabbath is God's perpetual sign of His eternal covenant between Him and His people. Joyful observance of this holy time from evening to evening, sunset to sunset, is a celebration of God's creative and redemptive acts. (Gen. 2:1-3; Ex. 20:8-11; Luke 4:16; Isa. 56:5, 6; 58:13, 14; Matt. 12:1-12; Ex. 31:13-17; Eze. 20:12, 20; Deut. 5:12-15; Heb. 4:1-11; Lev. 23:32; Mark 1:32.)

### Richard Tabura

16. Mr. Tabura began to work at the Garden Burger plant in Clearfield on or about September 29, 2003.

17. Shortly after he was hired and at various times throughout his employment, both orally and in writing, Mr. Tabura informed management that he is a Seventh-day Adventist, and does not work on the Sabbath, which he observes from sundown Friday to sundown Saturday.

18.     Kellogg bought Garden Burger and assumed operation and control of the plant in or about 2007.

19.     During approximately the first three years that Kellogg operated the plant, Mr. Tabura worked a regular schedule, four days a week, ten hours a day, beginning at about 4:30 a.m.

20.     In about 2006 or 2007, the plant began to solicit volunteers for weekend shifts. Mr. Tabura provided the plant with a letter from his Pastor, Kevin James, documenting his Sabbath observance and requesting accommodation, in anticipation that voluntary weekends might become mandatory.

21.     Mr. Tabura submitted subsequent letters from his new pastor, Jeff Wait, on or about October 24, 2009, and October 28, 2011.

22.     Until late 2010 or early 2011Kellogg allowed Mr. Tabura  (and Ms. Diaz) to work shifts and schedules which did not require them to work on their Sabbath.

23.     However, in late 2010 or early 2011, Kellogg changed its scheduling practices to require all workers to work twelve (12) hour shifts, and also, every other weekend, including Saturday.

24.     Because of this shift change, for the first time, Mr. Tabura (and Ms. Diaz as well) was scheduled to work two (2) Saturdays each month.

25.      Kellogg also began changing its attendance policy, increasing points for unexcused absences from half a point to one point, and again to two points.

26.     Kellogg also informed Mr. Tabura (and Ms. Diaz) that he would have to use vacation leave, sick leave or find swaps with other employees, in order to avoid working when scheduled on Saturdays.

27.   Mr. Tabura began actively asking other employees if they would be willing to swap with him soon after the schedule changed, offering to work on Sundays if they would take his Saturday shifts.

28.   However, the Kellogg managers imposed unfair restrictions as to whom Mr. Tabura could swap with which made it difficult for him to find replacement workers.

29.   For example, Kellogg managers told Mr.Tabura he could swap with anyone else except those on the "A" shift, the shift he worked. Yet he later found that management utilized someone from the "A" shift, Cecilia Garcia, to cover his duties in his absence but would not afford him this option.

30.   Mr. Tabura also made arrangements to swap with Alicia Stewart and trained her to do the tasks he performed in the spice room.

31.   The work Mr. Tabura performed in the spice room was not difficult. There were recipe cards with amounts for each of the products which explained what needed to be added or mixed.

32.   On occasion, workers, including temporary workers, were assigned to the spice room when they had not been provided with any training previous training in the spice room.

33.   Shortly after Ms. Stewart agreed to swap with Mr. Tabura and was trained to do the work, Candy Cunnington transferred her to the same shift Tabura worked (the "A" shift), so that Ms. Stewart was no longer available to swap.

34.   On information and belief, Ms. Cunnington transferred Ms. Stewart in order to prevent Mr. Tabura from having a religious accommodation by swapping shifts with Ms. Stewart.

35.   As directed, when he could not find anyone to swap with, Mr. Tabura would call in on Saturdays he was scheduled to work to inform Kellogg that he would not be able to work

on that day.

36.     Kellogg also required Mr. Tabura to submit a form for each Saturday absence, which he
        did.

37.     Mr. Tabura noticed that his sick leave accruals were being reduced, and on information
        and belief, it appears that Defendant charged his Saturday absences to sick leave.

38.     Even though Kellogg had told Mr. Tabura he could "use" vacation or sick leave to cover
        his Saturday shifts and charged his absences to sick leave, without informing Mr. Tabura
        Kellogg began to assess attendance points for each Saturday shift he did not work, even
        though he had followed all company policies and rules regarding the use of his leave.

39.     Eventually, management told Tabura that he had accumulated ten (10) attendance points,
        and gave him a "verbal" warning, in writing, of his first discipline in July 2011.

40.     It surprised Mr. Tabura that he had accumulated these points because he still had accrued
        sick leave and vacation leave available, and his absences were being charged against his
        leave.

41.     In September 2011 management gave Mr. Tabura a written warning based on his
        attendance.

42.     On October 28, 2011, Mr. Tabura's pastor, Jeff Wait, wrote a letter to Kellogg requesting
        religious accommodation for Mr. Tabura.

43.     In that letter, Pastor Wait requested that Mr. Tabura be relieved of the obligation to work
        from sundown Friday to sundown Saturday, and suggested the following as possible
        accommodations:

        1.   Work extra time on other days;

        2.   Exchange Sabbath shifts with other employees for another day;

Tabura and Diaz v. Kellogg USA Inc.                                                    Complaint

    3.  Schedule his work on days other than the ones on which he is currently scheduled to work and/or

    4.  Work holidays, if required.

44.    When Mr. Tabura delivered this letter to Dean Shirra, the Floor Manager, Mr. Shirra seemed reluctant to accept it, and Mr. Tabura had to insist that he place it in his employment file.

45.    Kellogg's management chose not to implement any of these accommodation suggestions, and demanded that Mr. Tabura find his own swaps, which he had already been trying to do, with limited success because of management's actions in blocking his swaps.

46.    Out of frustration at being denied religious accommodation, and in fear of losing his job since he had been warned about accumulating ten (10) attendance points, Mr. Tabura contacted the Church State Council, an agency of his church that provides legal assistance to church members (and others) experiencing workplace discrimination on account of their religion.

47.    Church State Council Executive Director Alan J. Reinach, Esq., wrote a letter to Mr. Tabura's Floor Manager, Mr. Shirra, on October 19, 2011. He urged that the company resolve the accommodation problem. A copy of that letter is attached as Exhibit A.

48.    Mr. Reinach informed Mr. Shirra that he had told Mr. Tabura that he had the right to file a charge of religious discrimination with the Utah Labor Commission.

49.    Mr. Reinach also told Mr. Shirra that the company had illegally blocked Mr. Tabura's swaps, and that it had assessed him ten (10) attendance points without giving him notice and in violation of his legal rights.

50.    In response to this letter, Mr. Shirra and Rebecca Serr, from human resources, called Mr.

Tabura and Diaz v. Kellogg USA Inc.                          Complaint

Tabura into a meeting. The two were upset that they had received a letter from a lawyer who represented Mr. Tabura. Ms. Serr told Mr. Tabura that Kellogg would not accommodate him and that he would have to find his own coverage, using swaps, or use vacation or sick leave. Mr. Shirra did give Mr. Tabura three names of coworkers with whom he could seek swaps. However, Mr. Tabura had already spoken to two of them and they were not able to swap with him. The only new name Mr. Shirra gave him was that of John Andrews, who worked in packaging.

51.    As Mr. Tabura was leaving the meeting, Ms. Serr volunteered that she was helping some members of the LDS church with religious accommodations. This comment puzzled him, since she did not pretend to offer him any "help," insisting instead that the company would not accommodate him, and that he had to do it himself.

52.    Mr. Tabura immediately spoke to Mr. Andrews who indicated he might be willing to swap. Mr. Tabura next spoke to Mr. Andrews' supervisor, Ms. Cunnington, about swapping with Mr. Andrews. She told him she would not permit the swap.

53.    In December 2011 Defendant issued to Mr. Tabura what it characterized as a "Final Warning" due to the fact that he refused to work on his Saturday shifts.

54.    In January, 2012, Plaintiff Tabura had additional sick leave and vacation leave added to whatever remained left over from the prior year. Mr. Tabura continued to use that accrued leave to "cover" his Saturday shifts.

55.    In February, 2012, Mr. Shirra told Mr. Tabura that he had enough vacation leave to cover his Saturdays at least until summer.

56.    Defendant terminated Mr. Tabura on March 2, 2012 for accumulating 16 attendance points.  These points were given to him when he would not work on his Sabbath and was

Tabura and Diaz v. Kellogg USA Inc.                                                    Complaint

unable to find anyone to fill in for or trade with him.

57. On information and belief, some employees who did not need religious accommodation were permitted to accumulate more than sixteen (16) attendance points before being terminated, even as many as twenty (20) points.

**Guadalupe Diaz**

58. Ms. Diaz first began to work at the Garden Burger plant on a part-time basis and was hired full-time in January of 2004.

59. When Ms. Diaz submitted her employment application, she informed the company that that she does not work on her Sabbath, starting Friday at sundown through sundown on Saturday.

60. After Kellogg took over the plant, Ms. Diaz worked from Monday through Thursday, ten hours a day. Sometimes she worked overtime on Friday and/or Sunday. She never worked after sundown on Friday, or during the day on Saturday.

61. As discussed above, sometime in late 2010 or early 2011, Kellogg changed its scheduling practices to require all workers to work twelve (12) hour shifts, and also, every other weekend, including Saturday.

62. Kellogg also told Ms. Diaz was told that she would be assessed one point if she left early on Friday night to keep the Sabbath, and two points for not working an entire shift on Saturday.

63. Kellogg also told her she would have to use vacation leave, sick leave or find swaps in order to avoid working when scheduled on Saturdays, or if she needed to leave early on Friday.

64. Ms. Diaz spoke to Human Resources to discuss not working on Saturdays, but was told

she had to work the same schedule as everyone else, and would have to use accrued leave to cover her Saturday absences.

65.     Ms. Diaz protested to Mr. Shirra that she would need her vacation leave to visit her sister who was very sick, and that she did not feel she should forfeit her vacation time in order to avoid work on Saturdays. Mr. Shirra refused to accommodate her request.

66.     Ms. Diaz initially found a Baptist coworker who did not want to work on Sundays and was also worried about the changed schedule. The other employee's name was Chae Frank. Ms. Frank and Ms. Diaz went to Human Resources to discuss the situation. Kellogg accepted a written agreement wherein the two agreed to trade weekend day shifts so that Ms. Frank worked on Saturdays and Ms. Diaz worked on Sundays.  It is believed that this written agreement was later lost or removed from Ms. Diaz's personnel file.

67.     For a period of time, Ms. Diaz was able to swap shifts with Ms. Frank.  However, Kellogg fired Ms. Frank in or about December, 2011. Kellogg did give Ms. Diaz two names of persons from another shift with whom she could attempt to swap, Rebecca and Alicia. But only Rebecca agreed to swap with Ms. Diaz, and only on one occasion.

68.     After Kellogg terminated Ms. Frank, Ms.  Diaz met with her manager, Mr. Shirra, and gave him a letter from her pastor, Alfredo Campechamo, supporting her request for religious accommodation of her Sabbath, and suggesting specific ways that the company could accommodate Ms. Diaz, including:

    1.  Swap shifts with other employees

    2.  Work on Sundays or Holidays in place of Saturdays.

    3.  Work a flexible schedule so that she can leave the job on Friday afternoon before sundown, and return to work after sundown on Saturday;

    4.   Examine some other plan that you might suggest as a solution.

69.    Kellogg refused to provide Ms. Diaz with any type of religious accommodation. Mr. Shirra told Ms. Diaz that if he did anything for her, he would have to do so for everyone from all religions.

70.    There is no labor union, collective bargaining agreement or seniority system governing the assignment of shifts, and Kellogg could easily have assigned Ms. Diaz (and Mr. Tabura) to work Sundays instead of Saturdays. But it chose not to do so.

71.    Ms. Diaz repeatedly had to come to work on her days off in order to ask coworkers if they would swap shifts with her. Sometimes she was able to find persons who would swap with her, but quite often she was not and would have to use accrued leave to "cover" the missed shifts.

72.    On information and belief, Kellogg charged Ms. Diaz with points when she had to leave work early due to sickness, even while charging the time against her sick leave.

73.    On December 15, 2011, Defendant issued Ms. Diaz a "verbal warning" in the form of a written "Corrective/Disciplinary Action Form." She was charged with an attendance point for leaving work early, which was due to illness, and reported as such to the employer, but marked on the form as a "personal reason" which was not true.

74.    The discipline also noted that Kellogg had assessed Ms. Diaz ten (10) attendance points, although she had not previously been notified that she had been accumulating attendance points.

75.    Many of these points were attributable to leaving early on Friday evening in order to observe the Sabbath, or to Saturdays when she would not work.

76.    On January 12, 2012, Kellogg issued Ms. Diaz a "Corrective/Disciplinary Action Form"

Tabura and Diaz v. Kellogg USA Inc.                        Complaint

charging her with two (2) attendance points for calling off work on January 07, 2012, which was a Saturday.

77.     This second discipline was considered a "written warning" and threatened discharge if "attendance problems" persisted.

78.     In March, 2012, Ms. Diaz had to take vacation leave to visit her sister in Mexico, whom she feared was terminally ill. She wanted to see her sister before she died.

79.     Upon her return to work, Mr. Diaz had no more vacation leave to use to cover for Saturdays she was scheduled to work.

80.     Defendant issued Ms. Diaz a "Final Warning" in April 2012 for attendance points accrued from missing her Saturday shifts.

81.     After failing and refusing to make any effort to provide Ms. Diaz with religious accommodation, as required by law, Defendant unlawfully terminated her employment on May 3, 2012 for accruing too many attendance points after Ms. Diaz missed work on April 28, 2012 in observance of her Sabbath.


## FIRST CLAIM FOR RELIEF

### Disparate Treatment / Religious Discrimination in
### Violation of Title VII of the Civil Rights Act of 1964

82.     Plaintiffs incorporate by reference the allegations contained in paragraphs one (1) through seventy-nine (79) above, as though repeated and set forth in full herein.

83.     Plaintiffs were at all times herein employees covered by 42 U.S.C. § 2000e, *et seq*., prohibiting discrimination in employment on the basis of religion, and members of a protected class based on their religion – Seventh-day Adventist.

84.     Both have a sincerely held religious belief not to work on the Sabbath, from sundown Friday

to sundown Saturday.

85.   Kellogg was at all times herein an employer subject to 42 U.S.C. 2000e, *et seq*.

86.   Title VII of the Civil Rights Act, as amended, 42 U.S.C. Section 2000e *et. seq*. makes it unlawful for an employer to discriminate against an employee on the basis of religion.

87.   Plaintiffs each provided both written and oral notice to Kellogg of their religious observance of the Sabbath, and sought religious accommodation.

88.   Initially, Kellogg assigned Plaintiffs shifts that did not fall on their Sabbath. This changed in 2011 when it demanded that each of them work at least two Saturdays a month.

89.   From 2011 until it terminated Plaintiffs in 2012, Kellogg not only failed to provide Plaintiffs with religious accommodation, but  prevented each of them from being accommodated in order to justify terminating them, and engaged in a pattern of intentional religious discrimination, including but not limited to:

      a.   unfairly restricting with whom Plaintiffs could trade;

      b.   refusing to approve trades with coworkers who said they were willing to do so;

      c.   issuing attendance points at the same time that Plaintiffs were being charged for sick or vacation leave;

      d.   charging Plaintiff Diaz with attendance points when she was legitimately sick and had to leave work early, even though she had sick leave available, and the time was charged to sick leave;

      e.   refusing to remove them from the Saturday schedule;

      f.   Issuing discipline for engaging in their religious activity, i.e., for not working on Saturday.

Tabura and Diaz v. Kellogg USA Inc.                                   Complaint

90.   Kellogg also applied its attendance policy in a discriminatory manner, treating Plaintiffs Tabura and Diaz more harshly than other coworkers who were permitted to accumulate more attendance points without being terminated.

91.   Kellogg then chose to terminate both Mr. Tabura's and Ms. Diaz's employment in March and May, 2012.

92.   As a proximate result of Kellogg's discriminatory actions against Plaintiffs, Plaintiffs have been harmed in that they have suffered the loss of wages, salary, and benefits, in an amount according to proof.

93.   As a further proximate result of Kellogg's discriminatory actions against Plaintiffs, Plaintiffs have been harmed in that they have suffered public humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, in an amount according to proof.

94.   Because Kellogg's discriminatory actions were done maliciously and in reckless and wanton indifference to Mr. Tabura and Ms. Diaz's civil rights, Plaintiffs seek punitive damages sufficient to deter Kellogg from engaging in similar hiring practices, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated in the State of Utah.

95.   42 U.S.C. § 2000e-5(k) provides that the court may allow the prevailing party to recover a reasonable attorney's fee as part of the costs. As a result, Plaintiff is seeking reasonable attorney's fees and costs.


### SECOND CLAIM FOR RELIEF

**Failure to Provide Religious Accommodation
In Violation of Title VII**

Tabura and Diaz v. Kellogg USA Inc.                                             Complaint

96.     Plaintiffs incorporate by reference the allegations contained in paragraphs one (1) through ninety-three (93) above, as though repeated and set forth in full herein.

97.     Plaintiffs have a sincerely held belief in observing the Sabbath as a day of rest and worship, and a day to refrain from secular employment.

98.     Plaintiffs repeatedly requested religious accommodation for their Sabbath observance both orally and in writing.

99.     Title VII of the Civil Rights Act, as amended, 42 U.S.C. Section 2000e(j)  specifically requires employers to provide reasonable accommodation for  all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that such accommodation to an employee's or prospective employee's religious observance would incur an undue hardship.

100.    The statutory scheme of religious accommodation requires bilateral cooperation between management and the employee.

101.    Kellogg chose not to cooperate with Plaintiffs, or to participate in any efforts to provide religious accommodation to Mr. Tabura and Ms. Diaz.

102.    As interpreted by the U.S. Supreme Court, Title VII's requirement of reasonable accommodation requires that the accommodation eliminate the conflict between job and religious duties. See, *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977); *Ansonia v. Philbrook,* 479 U.S. 60 (1986).

103.    In the absence of a collective bargaining agreement, or any scheduling preferences due to a seniority system, Kellogg had unfettered discretion to remove Plaintiffs from the Saturday schedule, but failed and refused to do so.

Tabura and Diaz v. Kellogg USA Inc.                                                           Complaint

104. When Plaintiffs did not work their scheduled Saturday shifts, Kellogg could have easily covered their duties without incurring any operational difficulties or otherwise suffering any undue hardships, but chose not to do so.

105. Permitting Plaintiffs to be scheduled on Sundays instead of Saturdays would not have impacted the seniority rights of any other employees, since there was no seniority system, and no employees had a right to any particular schedule.

106. For example, Kellogg could have used temp workers (as it did for other employees) to cover Plaintiffs' Saturday shifts but chose not to do so.

107. Kellogg also could have continued to permit Plaintiffs to work on Sundays instead of Saturdays as a religious accommodation, but refused to do so after changed its schedule rotation.

108. Kellogg also had complete discretion in the administration of discipline, and had no obligation to issue Plaintiffs Tabura and Diaz verbal and written warnings for exercising their right to religious accommodation. Instead, Kellogg chose to assess them points, warnings, and ultimately terminate them for missing work on Saturdays.

109. Kellogg subsequently terminated both Plaintiffs because they had supposedly accumulated too many attendance points. However, virtually all of these points had been assessed by Kellogg when the Plaintiffs had not worked on Saturdays.

110. Kellogg did not suffer any undue hardship during the years that it did not require Plaintiffs to work on Sabbath.

111. Kellogg also did not suffer any undue hardship on those occasions when Ms. Diaz left early on a Friday evening, or when Plaintiffs called off a Saturday shift, because Defendant had sufficient staffing, both full time and temporary, to cover Plaintiffs' duties

Tabura and Diaz v. Kellogg USA Inc.                                                      Complaint

when they were absent.

112.  As a proximate result of Kellogg's discriminatory actions against Plaintiffs, as alleged above, Plaintiffs have been harmed in that they have suffered the loss of wages, salary, and benefits, in an amount according to proof.

113.  As a further proximate result of Kellogg's discriminatory actions against Plaintiffs, as alleged above, Plaintiffs have been harmed in that they have suffered public humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, in an amount according to proof.

114.  Because Kellogg's discriminatory actions were done maliciously and in reckless and wanton indifference to Mr. Tabura and Diaz's civil rights, Plaintiffs seek punitive damages sufficient to deter Defendant from engaging in similar hiring practices, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated in the State of Utah.

115.  42 U.S.C. § 2000e-5(k) provides that the court may allow the prevailing party to recover a reasonable attorney's fee as part of the costs. Plaintiffs are also seeking reasonable attorney's fees and costs.

### THIRD CLAIM FOR RELIEF
**Retaliation in Violation of
Title VII of the Civil Rights Act of 1964**

116.   Plaintiffs incorporate by reference the allegations contained in paragraphs one (1) through

one hundred sixteen (116) above, as though repeated and set forth in full herein.

117.   Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), it is an

unlawful employment practice for an employer to retaliate against an employee who

opposes unlawful discriminatory conduct.

118.   As alleged herein, Plaintiffs engaged in a protected activity when they repeatedly

requested religious accommodation for their Sabbath observance, including having their

pastors submit letters to Kellogg on their behalves.

119.   Mr. Tabura further engaged in a protected activity when his attorney wrote to Defendant on

October 26, 2011, and notified Kellogg that he had advised Mr. Tabura to file a charge of

religious discrimination with the Utah Labor Commission.

120.   Kellogg retaliated against Plaintiffs for seeking religious accommodation, and insisting on

their right not to violate the sanctity of the Sabbath by working on that day.

121.   The retaliatory conduct includes, but is not limited to: discriminatory application of

attendance policies; blocking swaps; issuing attendance points unfairly; refusing to

cooperate in providing a schedule to accommodate despite how easily this could have been

done without any undue hardship; and eventually terminating both Plaintiffs.

122.   As a result of Kellogg's retaliatory conduct complained of herein, Plaintiffs were subjected

to an adverse employment action in that they were discharged from employment.

123.   As a proximate result of Kellogg's discriminatory actions against Plaintiffs, as alleged

above, Plaintiffs have been harmed in that they have suffered the loss of wages, salary,

Tabura and Diaz v. Kellogg USA Inc.                                                    Complaint

and benefits, in an amount according to proof.

124.    As a further proximate result of Kellogg's discriminatory actions against Plaintiffs, as alleged above, Plaintiffs have been harmed in that they have suffered public humiliation, mental anguish, and emotional and physical distress, and have been injured in mind and body, in an amount according to proof.

125.    Because Kellogg's discriminatory actions were done maliciously and in reckless and wanton indifference to Mr. Tabura and Ms. Diaz's civil rights, Plaintiffs seek punitive damages sufficient to deter Defendant from engaging in similar hiring practices, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated in the State of Utah.

126.    Title 42 U.S.C. §§1988 and 2000e-5(k) provide that reasonable attorney's fees and costs are recoverable herein. Plaintiff is entitled to reasonable attorney's fees and costs.

## Demand for Jury Trial

127.    Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs RICHARD TABURA and GUADALUPE DIAZ respectfully request that this Court:

1.    Grant a permanent injunction enjoining Kellogg, its agents and employees, and all persons acting in active concert or participation with it, from engaging in religious discrimination, retaliation and harassment, and any other employment practice which discriminates on the basis of religion.

Tabura and Diaz v. Kellogg USA Inc.                                    Complaint

2.      Order Kellogg to institute and carry out policies, practices, training and programs which provide equal employment opportunities for religious observance, eradicate the effects of its past and present unlawful employment practices, and prevent future discrimination from occurring.

3.      Order Kellogg to make Plaintiffs whole by providing appropriate compensation for loss of earnings with pre-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices including reinstatement to their former jobs.

4.      Order Kellogg to make Plaintiffs whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful conduct, including but not limited to pain and suffering, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and humiliation, in amounts to be determined at trial.

5.      Order Kellogg to pay each of the Plaintiffs punitive damages sufficient to make an example of and to punish the Defendant.

6.      Order Kellogg to pay Plaintiff's reasonable attorney's fees and costs.

7.      Grant such further relief as this Court deems just and proper.

Dated this __18th__ day of February, 2014

**STRINDBERG & SCHOLNICK, LLC**

 _/s/ Erik Strindberg_____
Erik Strindberg
Attorneys for Plaintiffs

Tabura and Diaz v. Kellogg USA Inc.                                           Complaint