IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| RICHARD TABURA and GUADALUPE DIAZ,<br><br>     Plaintiffs,<br><br>     vs.<br><br>KELLOGG USA, INC.,<br><br>     Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br><br>Case No. 1:14-cv-00014-TC-PMW |

Plaintiffs Richard Tabura and Guadalupe Diaz were two employees who continually missed work mainly because they honored their religious Sabbath. Their employer, Defendant Kellogg USA, Inc. (Kellogg), fired them because of their absences; and consequently, Mr. Tabura and Ms. Diaz accuse Kellogg of religious discrimination under Title VII of Civil Rights Act of 1964, 78 Stat. 241, 253–66 (codified as amended at 42 U.S.C. §§ 2000e to 2000e-17).

Kellogg had a religion-neutral absence policy that allowed employees to use paid time off and to swap schedules. Further, Kellogg assisted Mr. Tabura and Ms. Diaz by advising them how to take advantage of their paid time off (vacation and sick time) and giving them names of co-workers who might swap or change

schedules with other employees.  As discussed below, under these circumstances,

Kellogg did not violate Title VII.

Mr. Tabura and Ms. Diaz assert three claims for relief: (1) disparate treatment,

(2) failure to accommodate, and (3) retaliation.  They now move for partial summary

judgment on the failure-to-accommodate claim (ECF No. 43), while Kellogg moves

for summary judgement on all three claims (ECF No. 42).  Having considered all the

written and oral arguments submitted in support and opposition of the two motions,

the court DENIES the Plaintiffs' motion and GRANTS Kellogg's motion for

summary judgment.

## BACKGROUND

Mr. Tabura and Ms. Diaz are Seventh Day Adventists who, as part of their

religion, abstain from working on their Sabbath, which runs from sundown Friday

night to sundown Saturday night.  Years ago, before 2011, they worked full

schedules and participated in their Sabbath practices with no conflict.  But when

demand for Kellogg's products increased, Kellogg increased production and changed

its work schedule.  Kellogg received some input from employees about what

scheduling program it should implement, and a majority of the employees voted for

the scheme that Kellogg adopted in March 2011.  The program was called

"continuous crewing," and it created four separate, rotating shifts: the A, B, C, and D

shifts. Under continuous crewing, employees were to work approximately two Saturdays a month and twenty-six Saturdays a year.

If employees needed to miss work on a particular day, they could amend their schedule by using paid time off or swapping with co-workers. Of course they could choose not to show up even when scheduled to work. Kellogg had an absence policy to manage that last situation. Under this policy, employees were assessed points for absences, and some absences were assessed more points than others. For example, an unannounced absence earned employees four points, whereas a late arrival or early departure earned them one point. As employees accrued points, Kellogg would implement its progressive-discipline program, which was a system of escalating responses that was intended to correct its employees' behaviors. Finally, if an employee accrued sixteen points over the course of twelve months and all the established progressive-discipline measures were exhausted, Kellogg then could fire the employee.

Kellogg treated Mr. Tabura and Ms. Diaz's Sabbath-related absences the same as it treated nonreligious absences. Mr. Tabura and Ms. Diaz used paid time off and swaps to avoid earning points under the absentee program, but this did not completely eliminate the conflict between their religious practices and Kellogg's requirements.

Every year, Mr. Tabura had 160 hours of paid time off and those hours could cover a little over thirteen twelve-hour shifts. If he used his paid time off to observe Sabbaths only, then he still would need to cover another approximately thirteen shifts. And if he did not swap with another employee, then those thirteen shifts would result in nearly twenty-six points, ten more than the sixteen-point limit in a given year.

Ms. Diaz had 200 hours of paid time off every year. Those could cover almost seventeen twelve-hour shifts, leaving a little more than nine shifts, which would result in eighteen absentee points. Again, eighteen points were over the limit.

When Mr. Tabura and Ms. Diaz wished to swap schedules with co-workers, it took some planning on their part. Mr. Tabura and Ms. Diaz worked on the A shift (a day shift), which was paired with the C shift (a night shift). For safety reasons, Kellogg prohibited employees from working more than a twelve-hour shift. Accordingly, Mr. Tabura and Ms. Diaz needed to find someone from the B or the D shift to swap with. Also, the B- and D-shift employees were not at the plant when Mr. Tabura and Ms. Diaz normally worked, so to secure a swap partner required going to the plant on a day off and trying to find someone who was trained to perform their specific jobs and with whom they normally did not work. To assist them, Kellogg gave them a list of workers who were appropriately trained.

**Mr. Tabura's point accumulation**

When Kellogg instituted the continuous-crewing program, Mr. Tabura trained his co-worker, Alicia Stewart, how to do his particular job, which was adding spices to the food; but one of Mr. Tabura's supervisors, Candy Cunningham, said Kellogg needed Ms. Stewart in another part of the plant. Later, Dean Shirra, another supervisor, recommended that Mr. Tabura swap with John Andrews, another co-worker. Mr. Tabura asked Mr. Andrews if he would consider swapping schedules, but before Mr. Andrews agreed to the swap, Ms. Cunningham told Mr. Tabura that the swap could not occur.

Mr. Tabura went to speak to B-shift employees "several times," but could not find a coworker who would swap with him. (Pls. Mem. Opp'n, at lviii, ECF No. 47.) When Mr. Tabura told Mr. Shirra that he could not find anyone willing to swap with him, Mr. Shirra did not respond and left the room.

Because Mr. Tabura had limited paid time off and he could not find a co-worker to swap with, he began accruing absence points for missed Saturdays. Mr. Tabura's first ten absence points were caused by his Sabbath observances. He then received two points for a Saturday absence on July 23, 2011, and another two points for a Saturday absence on September 13, 2011. These two absences were not related to his religious observance. After that, Mr. Shirra discussed with Mr. Tabura, as part

5

of Kellogg's progressive-discipline measures, how he had accumulated fourteen points and how two more points would result in termination.

In October, Mr. Tabura's attorney and his pastor wrote to Kellogg requesting that the company further accommodate Mr. Tabura's religious practice of not working on his Sabbath. Soon after that, Mr. Tabura met with his supervisors, Rebecca Serr and Mr. Shirra, to discuss the letters. Mr. Tabura feels that Ms. Serr was upset and she "scolded" him. She told Mr. Tabura that "she would not accommodate" him and that he would need to find a co-worker to swap with on his own. (Tabura Dep. 250, ECF No. 52-1.) Sometime after this meeting, according to Mr. Tabura, Ms. Cunningham used harsh and "foul language" around Mr. Tabura and other employees. (Id. at 239:10–240:24.)

On November 11, 2011, Mr. Tabura forgot to punch in after lunch. He immediately told his supervisor at the time, Rosa Mendiola, and she said that she would "take care of it." (Id. at 146:3–25.) Despite Ms. Mendiola's statement, Kellogg issued one more point even though at one time Kellogg was more lax about clocking in after lunch. Mr. Shirra previously had allowed his favorite employees to clock in late without assessing points.

Mr. Tabura received another point ten days later on November 21 when he clocked in a half hour late to start his shift. He says he "does not remember clocking

in late," but he does not dispute that he did.  (Pls. Mem. Opp'n, at xxii.)  On February

13, 2012, he failed to clock in after his lunch, and Kellogg assessed another point.

He now had seventeen points, one over the sixteen-point threshold.  The progressive-

discipline measures were exhausted, and in March 2012, Kellogg fired Mr. Tabura.

**Ms. Diaz's point accumulation**

Ms. Diaz's story is similar.  After Kellogg began the continuous-crewing

program, Ms. Diaz initially set up a swap with a co-worker who was Baptist.

Between them, they were able to resolve the conflict between their work schedules

and their individual religious practices.  That arrangement ended when the co-worker

left Kellogg for unrelated reasons.  After that, Kellogg gave Ms. Diaz the name of a

co-worker who might be willing to swap, and Ms. Diaz asked three to four other

co-workers to swap with her.  These efforts were not successful; one co-worker

swapped with Ms. Diaz once, but declined to do it again.

Ms. Diaz could have used vacation and sick time for Saturday absences.

Instead, she used the vacation time to visit her sister in Mexico who she thought was

dying.  Also, Ms. Diaz chose to save her sick time for when she was actually ill.

By December 9, 2011, after leaving early on a Friday evening for her Sabbath,

her accumulated point total reached ten.  This triggered Kellogg's progressive-

discipline program and Ms. Diaz's supervisor brought her point total to her attention.

Within a month, she received four more points, which was the result, at least in part, to a Saturday absence; now she was just two points shy of sixteen.

On April 14, 2012, a Saturday, Ms. Diaz missed work. Kellogg assessed her four points because she did not notify Kellogg even though she had previously told her supervisor that she would not work any Saturday. Because Kellogg had not exhausted its progressive-discipline measures, it did not fire her then despite her eighteen points. Instead, Kellogg warned Ms. Diaz again.

At this point, Ms. Diaz had no more vacation or sick time to use for her next absence. She missed her subsequent Saturday shifts, including April 28, 2012. With no more progressive-discipline actions left and with her point total exceeding sixteen, Kellogg fired her on May 3, 2012.

There were measures Kellogg could have taken instead of firing Mr. Tabura and Ms. Diaz.[1] At times, Kellogg would ask employees to volunteer to fill shifts caused by other employees using their paid time off or leave under the Family and Medical Leave Act, 29 U.S.C. §§ 2601–2654 (2012). Kellogg could have done the same for Mr. Tabura and Ms. Diaz. Also, Kellogg could have hired temporary workers or "relief people." (Pls. Mem. Opp'n, at xl.) Kellogg cross-trained

---

[1] The court discusses whether Kellogg was required to take these measures below.

employees to operate more than one piece of equipment and could have moved one of those employees around to cover for Mr. Tabura and Ms. Diaz. If Mr. Tabura or Ms. Diaz was absent without a scheduled replacement, their supervisor could "move people around to cover for them." (Id. at lvi.) And Kellogg could, and regularly did require employees to work overtime. (Id.)

But Kellogg did not take any of those measures.

## DISCUSSION

I.      **Legal standards**

    A.      **Summary Judgment**

A court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact" and that the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should not be granted "if the dispute about a material fact is 'genuine,' that is, when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), quoted with approval in Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient . . . ." Id. at 252.

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact . . . ." Libertarian Party v. Herrera, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing Fed. R. Civ. P. 56; Celotex, 477 U.S. at 323). If the moving party would not bear the burden of persuasion at trial, the moving party can satisfy its initial burden by pointing out the absence of evidence on an essential element. Id. If this initial burden is fulfilled, "the burden then shifts to the opponent to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant." Id. (citing Fed. R. Civ. P. 56(e); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888–90 (1990); Celotex, 477 U.S. at 324).

When a court receives, opposing motions for summary judgment, the court treats them separately. Buell Cabinet Co., Inc. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979), quoted with approval in Christy v. Travelers Indem. Co., 810 F.3d 1220, 1225 n.3 (10th Cir. 2016). And when the court considers cross-motions for summary judgment, the court may "assume that no evidence needs to be considered other than that filed by the parties . . . ." Atl. Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000), quoted with approval in Ultra Clean Holdings, Inc. v. TFG-California, LP, 534 F. App'x 776, 780 (10th Cir. 2013).

Here, Kellogg moves for summary judgment on all three claims: disparate treatment, reasonable accommodation, and retaliation. Mr. Tabura and Ms. Diaz move for summary judgement on only the reasonable-accommodation claim.

### B. The <u>McDonnell Douglas</u> framework

Notwithstanding a plaintiff's ultimate burden of persuasion, the Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973), provided a burden-shifting framework that gives plaintiffs the opportunity to establish a presumption of unlawful discrimination under Title VII. <u>Id.</u>; <u>see also</u> <u>Schaffer ex rel. Schaffer v. Weast</u>, 546 U.S. 49, 56–57 (2005) (holding that plaintiffs still bear the ultimate burden of persuasion for their claims); <u>Anaeme v. Diagnostek, Inc.</u>, 164 F.3d 1275, 1279 (10th Cir. 1999) (same). Under the <u>McDonnell Douglas</u> framework, plaintiffs have "the initial burden . . . of establishing a prima facie case of . . . discrimination." 411 U.S. at 802. What evidence and facts are necessary to fulfill this burden will vary, <u>id.</u> at 802 n.13, and the evidence may be only circumstantial. <u>U.S. Postal Serv. Bd. of Gov'rs v. Aikens</u>, 460 U.S. 711, 716 (1983); <u>Anaeme</u>, 164 F.3d at 1278. Once the prima facie case is established, the court can presume the employer acted with unlawful discriminatory intent until the employer meets its burden of producing evidence that it had "some legitimate, nondiscriminatory reason for" its actions. <u>McDonnell Douglas</u>, 411 U.S. at 802. "This burden is one of production, not

persuasion." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142

(2000) (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 409 U.S. 502, 509 (1993)).  This

burden "has been characterized as an 'exceedingly light' one." <u>Anaeme</u>, 164 F.3d at

1279 (quoting <u>Perryman v. Johnson Prods. Co.</u>, 698 F.2d 1138, 1142 (11th Cir.

1983)).  Once the employer meets this burden, the presumption of discrimination

"simply drops out of the picture." <u>Swackhammer v. Sprint/United Mgmt. Co.</u>, 493

F.3d 1160, 1167 (10th Cir. 2007) (quoting <u>St. Mary's</u>, 509 U.S. at 511) (quotation

marks omitted).

        After this, plaintiffs "must . . . be afforded a fair opportunity to show that [the

employer's] stated reason for [the adverse action] was in fact pretext," <u>McDonnell

Douglas</u>, 411 U.S. at 804, or put another way, "a coverup for a[n improper]

discriminatory decision," <u>id.</u> at 805.  And when the defendant is the party moving for

summary judgment, plaintiffs must still furnish sufficient evidence for a jury to find

in their favor.  <u>Reeves</u>, 530 U.S. at 148–49, 150; <u>DeFreitas v. Horizon Inv. Mgmt.

Corp.</u>, 577 F.3d 1151, 1163–64 (10th Cir. 2009); <u>see</u> <u>Anaeme</u>, 164 F.3d at 1279,

1281–83.

        Mr. Tabura and Ms. Diaz assert that the decision of <u>Randle v. City of Aurora</u>,

69 F.3d 441 (10th Cir. 1995), mandates that this court must deny Kellogg's motion

because they have presented evidence that Kellogg's justification is pretext or should

not be believed. The court, in <u>Randle</u>, held that the employee had submitted sufficient evidence of the defendant's pretext and the question about discrimination should have been submitted to the jury. <u>See</u> <u>id.</u> at 451–53. Yet the court did not say that summary judgment should always be withheld after a plaintiff offers any amount of evidence. <u>See</u> <u>id.</u> at 451 n.14. In a subsequent decision, the Tenth Circuit Court of Appeals, in <u>DeFreitas</u>, held that even when employees produce enough evidence for a jury to find the employer's justification was pretext, the court may still grant summary judgment against the employees when they fail to present sufficient evidence on the ultimate issue, namely whether the employer unlawfully discriminated. 577 F.3d at 1162–64.

## II. The claims for relief

### A. Disparate treatment

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." <u>DeFreitas</u>, 577 F.3d at 1162 (quoting 42 U.S.C. § 2000e-2(a)(1)) (ellipses in original). When employing the <u>McDonnell Douglas</u> framework in the context of a religious disparate-treatment case, the Tenth Circuit has held that some specific facts must be established to satisfy the plaintiff's initial prima facie burden. The minimal requirements differ from case to

case. The Plaintiffs and Kellogg disagree about what is required, so the court will analyze the different approaches.

In DeFreitas, a religious-discrimination case, the plaintiff needed to show: "(1) that [the employee] was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow [the] employer's religious beliefs." Id. at 1162 (quoting Fischer v. Forestwood Co., 525 F.3d 972, 978–79 (10th Cir. 2008)); Shapolia v. Los Alamos Nat'l Lab., 992 F.2d 1033, 1038 (10th Cir. 1993).

In Trujillo v. University of Colorado Health Sciences Center, 157 F.3d 1211 (10th Cir. 1998), a race-discrimination case, the court approved of the trial court's implementation of this test: "showing (1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." Id. at 1215.

In Plotke v. White, 405 F.3d 1092 (10th Cir. 2005), a gender-discrimination case, the court was satisfied with these facts: the claimant "(1) belonged to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge." Id. at 1099.

14

The Plotke court stated what makes a prima facie case can change depending "on the context of the claim" and that this initial burden "was never intended to be rigid, mechanized or ritualistic." Id. (quoting Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1139 (10th Cir. 2000)). The "fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios." Id. at 1100. "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" Id. (quoting Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1229 (10th Cir. 2000)).

Here, the court concludes that Mr. Tabura and Ms. Diaz can establish a prima facie case if they show: (1) they were a member of a protected class; (2) they were subjected to an adverse action; (3) their job performance was satisfactory at the time of the adverse action or, in other words, they were qualified for the position; (4) similarly situated employees were treated differently; and (5) their position was not eliminated after their termination.

No party disputes that both Mr. Tabura and Ms. Diaz were members of a protected class and that they were subjected to an adverse action by being fired. Also, Kellogg admits that they performed their jobs satisfactorily other than their absences. And Mr. Tabura and Ms. Diaz have established the fifth, and final,

element because Kellogg did not eliminate Mr. Tabura's or Ms. Diaz's positions after they were terminated.

But Mr. Tabura and Ms. Diaz have not shown that similarly situated employees were treated differently. Similarly situated employees at Kellogg were subject to the same absence policy; Mr. Tabura and Ms. Diaz have admitted that they worked under the same policy as their fellow co-workers.

Even if the evidence sufficiently established a prima facie case of disparate treatment, which would entitle Mr. Tabura and Ms. Diaz to the McDonnell Douglas presumption, Kellogg maintains that it was justified in firing Mr. Tabura and Ms. Diaz because it merely executed its objective and religion-neutral absentee policy. Kellogg argues that all employees must comply with its general policy, the nonreligious and the religious alike. Kellogg's blanket policy applied to all employees, and does not show a motivation to discriminate against Seventh Day Adventists or other religious employees.

Because Kellogg has met its burden under the McDonnell Douglas framework, the presumption "simply drops out of the picture," Swackhammer, 493 F.3d at 1167 (quoting St. Mary's, 509 U.S. at 511) (quotation marks omitted). From here, the court weighs all the evidence to determine whether Mr. Tabura and Ms.

Diaz have presented enough evidence for a reasonable jury to reach a verdict in their favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

To prevail on their claim, Mr. Tabura and Ms. Diaz must show that Kellogg fired them "because of" their religion. 42 U.S.C. § 2000e-2(a)(1). The term "because of," in this statute, prohibits the employer from making religion "a 'motivating factor' in an employment decision." <u>E.E.O.C. v. Abercrombie & Fitch</u>, 135 S. Ct. 2028, 2032 (2015) (quoting 42 U.S.C. § 2000e-2(m)).

Mr. Tabura and Ms. Diaz contend that the following six events show Kellogg's discriminatory motivation. First, they assert that Ms. Cunningham would not allow Mr. Tabura to swap with Ms. Stewart or Mr. Andrews even though Mr. Shirra had already said a swap with Mr. Andrews would be okay. But Ms. Stewart could not swap with Mr. Tabura because they both worked on the A shift, so Ms. Stewart's willingness to swap with Mr. Tabura could not resolve the conflict. Because Mr. Andrews worked the A shift, he, too, could not swap with Mr. Tabura.[2] Furthermore, Mr. Tabura admits that Mr. Andrew never agreed to swap with Mr. Tabura. As Mr. Tabura remembered it, Mr. Andrews said "he'd have to

-------------------------

[2] At the hearing on the motions, Kellogg proffered that its denial of proposed swaps were because both the co-workers worked the same shift as Mr. Tabura.

think about it" or "he would give it some thought."  (Tabura Dep. 227–28, ECF
No. 52-1.)

Second, Mr. Tabura says that when he asked Mr. Shirra for help, Mr. Shirra
"brushed [him] off, and would not talk" to him about his problem.  (Tabura Decl.
para. 17, ECF No. 47-6).  This discussion occurred after Mr. Shirra received a letter
from Mr. Tabura's pastor.  (Tabura Decl. para. 17.)  Although Mr. Tabura's
declaration describes Mr. Shirra as brushing him off, Mr. Tabura's deposition
testimony was different:

> Q:   Did you approach Mr. Shirra about Exhibit 5[, the
>      letter from the pastor]?
>
> A:   Yes.
>
> Q:   What did you say?
>
> A:   Just handed it to him, because he already had one
>      already in his file.
>
> Q:   What did you say?
>
> A:   I don't remember the word-for-word, so I can't . . .
>
> . . . .
>
> Q:   Do you remember generally what you said to
>      Mr. Shirra?
>
> A:   I said I got another letter from my pastor to give
>      you, and I handed it to him.
>
> Q:   What did he say?
>
> A:   Nothing.
>
> Q:   He just stood there?

A:    He looked—didn't answer me back.  He just took
      it.

Q:    He didn't say a thing?

A:    Didn't say nothing at all, hardly, that I can
      remember.

Q:    You can't remember if he said anything?

A:    He didn't say nothing.  He just—face got red.

. . . .

Q:    You don't remember what Mr. Shirra may have
      said in response?

A:    He said "thank you," and took it and got red.  I
      remember that thank you part.

Q:    He said "thank you"?

A:    I think so, but I don't—

Q:    Did he say anything else to you?

A:    No, he didn't.

(Tabura Dep. 130–31.)  Regardless of which version is closer to reality, Mr. Shirra's

failure to answer questions does not prove discrimination.  And after Ms. Serr, Mr.

Shirra, and Mr. Tabura met to discuss a letter from Mr. Tabura's attorney, Mr. Shirra

gave Mr. Tabura "some names" of "potential swaps."  (Id. at 252–53).  No

reasonable jury would find Mr. Shirra's silence after the delivery of the pastor's letter

to be evidence of improper motive, especially when Mr. Shirra helped Mr. Tabura

find co-workers with whom he could swap shifts.

Third, Mr. Tabura claims that Ms. Serr, after receiving letters from his pastor and attorney, was visibly upset and scolded him while she told him that she would not accommodate him. In their meeting, she said that Kellogg "would not accommodate [him] and [he] would have to find [his] own swaps," but no one issued any verbal or written warning to Mr. Tabura because his attorney and minister wrote to Kellogg demanding accommodation. (Id. at 249–50.) Even though she used the word "accommodate," which is oddly close to the statutory reasonable-accommodation requirement, that alone is not enough for a reasonable jury to find Kellogg acted with an improper motive.

Fourth, Mr. Tabura contends that Ms. Cunningham used foul language around him and other employees. Ms. Cunningham's use of strong language directed at Mr. Tabura does not prove a motivation against Mr. Tabura or Ms. Diaz because of their religious practices or beliefs. Even if Ms. Cunningham had said "f—— you" to Mr. Tabura, immediately apologized, and then rolled her eyes (id. at 278), she also used this language in front of others, not just in front of Mr. Tabura. (Id. at. 239–40.) And Mr. Tabura admits that he does not know why Ms. Cunningham said this to him:

> Q:      You don't know why she said that to you?
>
> A:      That's right.
>
> Q:      It could have been based on your performance, correct?
>
> A:      I can't answer that either.  I don't know.

> Q:     You have no way to know, do you?
>
> A:     There's no way to know.

(Id. at 245–46.)  Although Ms. Cunningham's language was unprofessional, it is insufficient evidence to establish an unlawful motivation on Kellogg's part.

Fifth, Mr. Tabura claims Kellogg's motivation is shown by its refusal to forgive his November 11 late clock-in despite (1) Ms. Mendiola saying she would take care of it; (2) Kellogg's policy allowing forgiveness of one late clock-in per quarter; and (3) Mr. Shirra having, in the past, forgiven late clock-ins for his favorite employees.  Yet Kellogg's refusal to forgive the late clock-ins during November 2011 and February 2012 fails to prove that Kellogg was motivated by Mr. Tabura's religion.  On November 11, he forgot to punch the clock on his return from lunch. He spoke to his supervisor at the time, Ms. Mendiola, who said she would "take care of it." (Id. at 143–46.)  For whatever reason, Mr. Tabura was still assessed a point for the late clock-in, which resulted in a written warning.  Mr. Tabura signed the warning, acknowledging that he had accumulated fifteen points.  (Def. Mot. Summ. J. Ex. 10, ECF No. 42-11.)  Ten days after Mr. Tabura clocked in late, he did it again on November 21, which placed his score at sixteen.  Kellogg did not fire Mr. Tabura at this time even though his accumulation had reached the threshold for being fired. It was not until Mr. Tabura clocked in late on February 13, raising his accumulated

total to seventeen points, that Kellogg fired Mr. Tabura.  Although Kellogg's policy

says the company may forgive one late clock-in per annual quarter, employees must

still complete a form and submit it to their supervisor.  (Def. Mot. Summ. J. Ex. 5, at

16, ECF No. 28-6 [hereinafter Kellogg Handbook].)  The Plaintiffs cite no evidence

that Mr. Tabura submitted a form requesting forgiveness.  And finally, Mr. Shirra's

practice of letting his favorite employees take long lunches without assessing points

(Tabura Dep. 318–19) does not mean Mr. Tabura was entitled to the same treatment.

The Tenth Circuit, in Swackhammer v. Spring/United Management Co., 493 F.3d

1160 (10th Cir. 2007), held that favoritism based on friendship might be unfair, but it

is not necessarily unlawful discrimination.  Id. at 1171–72 (citing Neal v. Roche, 349

F.3d 1246, 1251 (10th Cir. 2003)), cited with approval in DeFreitas v. Horizon Inv.

Mgmt. Corp., 577 F.3d 1151, 1163 (10th Cir. 2009).  The same conclusion is proper

here; there is no evidence that Mr. Shirra's favoritism or actions were motivated by

anyone's religion.

Sixth, and finally, Plaintiffs claim that Mr. Shirra assessed Ms. Diaz one point

for leaving early after he told her she could.  Also, Ms. Diaz was assessed four points

for an unannounced Saturday absence rather than two points even though Ms. Diaz

had repeatedly informed the company she would not work Saturdays.  Even if true,

these events are not enough evidence for a reasonable jury to find discriminatory motivation.

Furthermore, the Plaintiffs' evidence contradicts their arguments. The Plaintiffs' opposing memorandum says that Mr. Shirra told Ms. Diaz that "she could leave early on a Friday . . . but then assessed her attendance points for an unexcused absence." (Pls. Mem. Opp'n 5, ECF No. 47.) But Ms. Diaz's deposition testimony shows that Ms. Diaz understood that she would be assessed a point for her early departure:

> Q: And you did not receive authorization to do that in advance, did you?
>
> A: Yes, I received it.
>
> . . . .
>
> Q: And who gave you that approval?
>
> A: Dean [Shirra].
>
> Q: Did Dean tell you that you would not receive an attendance point if you did that?
>
> A: He told me that I was going to receive it.
>
> Q: Okay. So you understood that if you left early that day, you would receive one point under the attendance policy?
>
> A: Yes.
>
> Q: And you understood that that would bring you to ten points under the attendance policy?
>
> A: Yes.
>
> Q: And you left early anyway?

> A: Yes, because I was not going to work once the sun set on Friday. That's why I left.
>
> Q: But you understood exactly what would happen if you left early on that day, didn't you?
>
> A: Yes.

(Diaz Dep. 134–35, ECF No. 52–2.) Ms. Diaz understood Kellogg's policy and understood that she would be assessed the points. Yet, it was not so clear to Ms. Diaz that she would be assessed four points for an unannounced absence on Saturday, April 14, 2012. During Ms. Diaz's deposition, she was asked about the written warning she received after missing her April 14 shift:

> Q: But do you remember that you were issued this warning for missing your shift on April 14, 2012?
>
> A: Yes.
>
> Q: And Dean explained that you had not called in ahead of time or arranged for someone else to work your shift, correct?
>
> A: The thing is I wouldn't call on Saturdays. I didn't know I had to call.
>
> Q: So you agree that you did not call ahead before missing your shift on April 14, 2012?
>
> A: Yes.

(Id. at 144–45 (referring to Def. Mot. Summ. J. Ex. 15, ECF No. 42-16).) Under Kellogg's policy,

> [e]mployees are required to notify the company at least 1 hour before the start of their scheduled shift if they are going to be late or absent. Employees should contact the

24

> call in line . . . if they are not going to report to work
> . . . to enable management to take action for coverage of
> their position.

(Kellogg Handbook 16.)  Even if Ms. Diaz did not know the policy, it would be

unreasonable for a jury to find that Kellogg's implementation of this objective policy

and its assessment of four points rather than two was evidence of discriminatory

motivation.

Finally, because of the particular way Ms. Diaz accumulated points, by the

time she had exhausted her warnings, she had eighteen points.  So the extra two

points assessed for the April 14 absence did not affect when she could be fired under

the policy.  In essence, Kellogg acted the same way regardless of whether the April

14 absence resulted in two or four points.

In all, the evidence Plaintiffs point to is not sufficient for a reasonable jury to

find in favor of Mr. Tabura or Ms. Diaz.  Accordingly, summary judgment is granted

to Kellogg for the disparate-treatment claim.

### B.        Failure to accommodate

Courts treat a claim for failure to accommodate like an independent cause of

action even though the basis for the claim is found in the definition section of Title

VII.  E.g., Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481, 1486 (10th Cir. 1989) ("As

the Supreme Court has noted, '[t]he reasonable accommodation duty was

incorporated into the statute, somewhat awkwardly, in the definition of religion.'") (quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 63 n. 1 (1986)). Title VII proscribes employers from taking adverse actions against an employee "because of" an employee's "religion." E.E.O.C. v. Abercrombie & Fitch, 135 S. Ct. 2028, 2031–32 (2015) (quoting 42 U.S.C. § 2000e–2(a)). "Religion" is defined to include "all aspects of religious observance and practice . . . unless an employer demonstrates that he is unable to reasonably accommodate" a "religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (emphases added).

The Tenth Circuit uses the McDonnell Douglas burden-shifting framework when assessing whether an employer has failed to accommodate an employee's religious practices. Thomas v. Nat'l Ass'n of Letter Carriers, 225 F.3d 1149, 1155 (10th Cir. 2000). Employees meet their prima facie obligation by showing "(1) [they] had a bona fide religious belief that conflicts with an employment requirement; (2) [they] informed their employer of this belief; and (3) [they were] fired for failure to comply with the conflicting employment requirement." Id. at 1155 (citing Toledo, 892 F.2d at 1486). Kellogg does not dispute that Mr. Tabura and Ms. Diaz met their prima facie burden. (Def. Mot. Summ. J., at xxxviii–xxxix, ECF No. 42.)

Accordingly, the burden shifts to Kellogg "to (1) conclusively rebut one or more elements of the prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable reasonably to accommodate the employee's religious needs without undue hardship." Thomas, 225 F.3d at 1156 (citing Toledo, 892 F.2d at 1486). Kellogg asserts that its religious-neutral absentee policy is a reasonable accommodation and the additional proposed accommodations, such as going understaffed, hiring replacement workers, or forcing other workers to work the Plaintiffs' shifts, would constitute undue hardships.

      1.      <u>Duty to reasonably accommodate</u>

The regulations and the case law support Kellogg's contention about reasonable accommodation. The Equal Employment Opportunity Commission's regulations suggest employers consider allowing employees with a scheduling conflict to swap shifts. 29 C.F.R. § 1605.2(d)(i) (2015) ("Reasonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available. One means of substitution is the voluntary swap."). Likewise, courts recognize shift-swapping as a reasonable accommodation. Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 77 (1977); Thomas, 225 F.3d at 1153; U.S. v. City of Albuquerque, 545 F.2d 110, 113–15 (10th Cir. 1976); see Ellington v. Murray Energy, No. 2:07-cv-766-DAK, 2010

WL 3855277 (D. Utah 2010) (unpublished) ("[The employer] allowed [Mr. Ellington] to swap shifts or use personal days or vacation days to accommodate any conflicts with his Sabbath observance.").

For instance, in Thomas, the employee's Sabbath conflicted with his work schedule. 225 F.3d at 1153. The Tenth Circuit held that the employer satisfied its duty to accommodate by allowing Mr. Thomas to use vacation time, permitting him to swap with co-workers, asking the union to exempt Mr. Thomas from the requirement that all workers work five out of six Saturdays, and recommending Mr. Thomas apply for another position. The court understood that "the employer had done all that was reasonably required of it when it was amenable to, and receptive to, efforts that the employee could have conducted for himself to arrange his own schedule swaps." 225 F.3d at 1157 (discussing City of Albuquerque, 545 F.2d 110). Indeed, the court recognized that "it would have been unreasonable to require the employer to go further and attempt to arrange a schedule swap for the" employee. Id.

In City of Albuquerque, the employer (the city's fire department) allowed one of its firefighters, who observed the Sabbath, to use vacation time, take leave without pay, or swap shifts with another employee. 545 F.2d at 113. If the department's staffing levels were low, it would deny employee requests for time off because it needed a minimum number of fighters available at any given time. Id. The court

said, "For understandable reasons, the policy within the department was for the fire[fighters] to arrange their own trade-offs as the supervisors did not want to be in the position of coercing trade-offs." Id. Yet the firefighter with the religious conflict testified that he "never had much luck in trading shifts with other fire[fighters]." Id. Regardless, the Tenth Circuit upheld the trial court's finding that the department's policy reasonably accommodated the firefighter's religious practices.

Mr. Tabura and Ms. Diaz contend that the Court in E.E.O.C. v. Abercrombie & Fitch, 135 S. Ct. 2028 (2015), held that an employer must treat employees with a religion-work conflict better than employees without a conflict. In Abercrombie, the employer did not hire an applicant who wore a hijab during her interview. Id. at 2031. The employer said that it was merely applying a nonreligious-based policy that employees could not wear things on their heads like "caps." Id. The language from the Abercrombie opinion that best supports the Plaintiffs' proposition reads,

> Abercrombie's argument that a neutral policy cannot constitute "intentional discrimination" may make sense in other contexts. But Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an

> accommodation as an "aspec[t] of religious . . . practice,"
> it is no response that the subsequent "fail[ure] . . . to hire"
> was due to an otherwise-neutral policy.  Title VII requires
> otherwise-neutral policies to give way to the need for an
> accommodation.

Id. at 2034.  While the Court acknowledged that Title VII entitles a religious

employee to some reasonable accommodations, it also stated that a neutral policy can

"make sense" in certain contexts.  A neutral policy can include a reasonable

accommodation to religious employees—giving the religious and the nonreligious

the opportunity to participate in the accommodation.

Here, Kellogg's policy incorporated its reasonable accommodations.  In

addition to allowing employees to use all their paid time off, they could also swap

shifts.  Mr. Tabura and Ms. Diaz had almost the same accommodations that the

plaintiffs in Thomas and City of Albuquerque had.  Those accommodations were

incorporated into Kellogg's general policy.

And even if that were not the case, the Court, in Abercrombie, recognized that

the right to accommodation is not absolute; an employer need not give an

accommodation that would pose an undue hardship.  Id. at 2032 ("For brevity's sake,

we will in the balance of this opinion usually omit reference to the [42 U.S.C.]

§ 2000e(j) "undue hardship" defense to the accommodation requirement, discussing

the requirement as though it is absolute.").

2.     Undue-hardship defense

The duty to accommodate "does not obligate the employer to consider and preclude an infinite number of possible accommodations." Thomas, 225 F.3d. at 1156, quoted with approval in Graff v. Henderson, 30 F. App'x 809, 810 (10th Cir. 2002).  The employer need not "bear more than de minimis cost" or deny the shift preferences of some employees to accommodate the religious needs of others.  Graff, 30 F. App'x at 810 (quoting Hardison, 432 U.S. at 81, 84); Ellington, 2010 WL 3855277, at *11.  "'Any cost in efficiency or wage expenditure that is more than de minimis constitutes undue hardship.'  The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable . . . can amount to undue hardship." Lee, 22 F.3d at 1023 (quoting Mann v. Frank, 7 F.3d 1365, 1370 (8th Cir.1993)) (citing Hardison, 432 U.S. at 84).

Mr. Tabura and Ms. Diaz propose that Kellogg could have accommodated their conflict by ignoring the absence policy or just excusing them from it.  To do that would have placed an undue hardship on Kellogg because it would have gone understaffed, hired replacement workers, or denied other employees their preferred shifts.  Mr. Tabura and Ms. Diaz also suggest Kellogg should have asked the Plaintiffs' co-workers to swap with them.  Yet, as the Tenth Circuit recognized in City of Albuquerque, it is reasonable for the employer to leave it to employees to

arrange their swaps. 545 F.2d at 113. For Kellogg to do more would border on

coercing nonreligious employees to swap. All these possible accommodations would

place undue hardships on Kellogg. Accordingly, it did not fail to reasonably

accommodate Mr. Tabura and Ms. Diaz's conflict.

### C. Retaliation

Mr. Tabura and Ms. Diaz's third, and final, claim for relief is that Kellogg

retaliated against them for the 2011 letters that were sent by their pastors and attorney

seeking accommodation. Employers are prohibited from retaliating against

employees who participate in activities protected by Title VII. 42 U.S.C. § 2000-e3;

Zokari v. Gates, 561 F.3d 1076, 1081 (10th Cir. 2009). Again, the Tenth Circuit has

applied the McDonnell Douglas framework when assessing a retaliation claim. A

prima facie case can be established by showing, "(1) the plaintiff's 'protected

opposition' under § 2000e-3(a), (2) an adverse employment action against the

plaintiff, and (3) a causal connection between the 'protected opposition' and the

adverse employment action." Zokari, 561 F.3d at 1081 (citing Medina v. Income

Support Div., 413 F.3d 1131, 1135–36 (10th Cir. 2005)). If not much time elapses

between the protected opposition and the adverse action is close, the court can infer a

causal connection at the prima facie stage. Conroy v. Vilsack, 707 F.3d 1163, 1181

(10th Cir. 2013). If the time between the events is more than three months and there

are no other supporting facts, then the causal connection cannot be inferred by temporal proximity alone.  Id. (citing Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.1999))

Kellogg concedes that Mr. Tabura and Ms. Diaz submitted letters from their ministers and attorney in October or November 2011, and this is a protected activity. Also, Kellogg does not dispute that Mr. Tabura's and Ms. Diaz's terminations in March and May 2012, respectively, were adverse actions.

Kellogg asserts that there is no causal connection between the letters and the firing of Mr. Tabura or Ms. Diaz.  The Court agrees with Kellogg.  Mr. Tabura met with his supervisors after they received the letters, and, when asked, he confirmed that "the company did not take any action against" him.  (Tabura Dep. 255, ECF No. 52-1.)  He agreed to the following:

> Q:    They didn't discipline you?
>
> A:    No.
>
> Q:    Okay.  They didn't change your schedule?
>
> A:    No.
>
> Q:    Okay.  They didn't modify your job responsibilities?
>
> A:    No.
>
> Q:    Okay.  So after this meeting you continued to do your job just as you had been doing it before Mr. Reinach's [Mr. Tabura's attorney] October letter?

A:    Yes.

(Id. at 255–56.)

Ms. Diaz, in her deposition, also confirmed that Kellogg "did not change anything about [her] job duties following the letter from [her] minister." (Diaz Dep. 97, ECF No. 52-2.) She agreed that it was fair to "say that the company treated [her] the same before receiving [her] minister's letter as it did after receiving [her] minister's letter." (Id. at 98.)

With the deposition testimony and because at least three months had passed between the receipt of the letters and the terminations, no reasonable jury would find that Kellogg retaliated against Mr. Tabura or Ms. Diaz for their letters. Indeed, in their motion for summary judgment, Mr. Tabura and Ms. Diaz argue,

> If [Ms.] Diaz or [Mr.] Tabura missed a Saturday and did not have leave time to cover it and had not received prior permission, Kellogg assessed them attendance points, just as it did with every other employee. Similarly, Kellogg used the same progressive discipline on the Plaintiffs that it used on all its employees for missing shifts, and ultimately terminated them when they reached or had been assessed 16 points, just as it did with every other employee who missed work for non-religious reasons. In sum, Kellogg subjected [Ms.] Diaz and [Mr.] Tabura to its neutral attendance and discipline policies and fired them for violating those policies, even though most of their absences were the result of their religious practices.

34

(Pls. Mot. Summ. J. 9, ECF No. 43 (citations to their statement of facts omitted).)

Mr. Tabura and Ms. Diaz repeat their arguments made in the disparate-treatment claim. Those arguments include Kellogg not allowing swaps with Ms. Stewart and assessing points for late clock-ins and absences. The court addressed these arguments above and comes to the same conclusion here; there is not enough evidence for a reasonable jury to issue a verdict in Mr. Tabura's or Ms. Diaz's favor. Kellogg terminated Mr. Tabura and Ms. Diaz because of their attendance points and not in retaliation for the letters requesting accommodation.

## **<u>ORDER</u>**

For these reasons, the court GRANTS Kellogg's motion for summary judgment (ECF No. 42) on the claims for disparate treatment, reasonable accommodation, and retaliation. The court accordingly DENIES Mr. Tabura and Ms. Diaz's motion for summary judgment. (ECF No. 43.) This disposes of all remaining claims. The court instructs the Clerk of the Court to close the case.

DATED this 7th day of July, 2016.

BY THE COURT:

_Tena Campbell_
TENA CAMPBELL
U.S. District Court Judge